WILLIAM H. REID, APPELLEE, v. LEONARD W. COLBY ET AL., APPELLANTS.

[FILED MAY 16, 1889.]

1. **Fraud:** FRAUDULENT REPRESENTATIONS: EVIDENCE. The claim of defendants in the nature of a counter-claim for damages growing out of the alleged misrepresentations of the plaintiff at the time of the sale and transfer by him to them of the farm, and personal property thereon, as to the amount and value of such personal property, under the facts and circumstances set out at length in the opinion, as well as their claim for damages of a similar nature arising from their failure to obtain the immediate possession of said farm and personal property — being resisted by the family of the plaintiff, he being absent in the penitentiary: *Held,* Inadmissible, and rightly rejected by the trial court.

2. **Trial:** EVIDENCE. The claim of defendants that in the execu-

tion of the note and mortgage, sued on by C. and H., to R., there was a mistake whereby said note and mortgage were drafted, made, and executed, so as to read and represent a sum one thousand dollars too much, and in excess of the sum actually agreed upon and intended, *held*, to be supported by the overwhelming weight of evidence, and that the finding of the trial court against such claim is clearly wrong.

3. **Verdict.** Where a verdict or finding is clearly wrong, it should be set aside. (*Seymour v. Street,* 5 Neb. 85.)

APPEAL from the district court of Gage county. Heard below before BROADY, J.

*Harwood, Ames & Kelly, Pemberton & Bush,* and *C. O. Bates,* for appellant, cited: 3 Suth. on Dam. 587, and cases cited in note; *Phillips v. Jones,* 12 Neb. 213, 215; *Munroe v. Pritchett,* 50 Am. Dec. 203; *Chatam Furnace Co. v. Moffatt,* 18 N. E. Rep. (Mass.) 169; *Cooper v. Schlesinger,* 111 U. S. 148; *Bower v. Fenn,* 90 Pa. St. 359.

*A. Hardy,* and *A. H. Babcock,* for appellee, cited: *Babcock v. Libbey,* 53 How. Pr. (N. Y.) 255; *Starr v. Bennett,* 5 Hill, (Id.) 303–306; *White v. Seaver,* 25 Barb. (Id.) 242; *Sawyer v. Prickett,* 19 Wall. 146.

COBB, J.

The plaintiff commenced his action in the district court of Gage county for the foreclosure of a real estate mortgage executed by L. W. Colby and Alfred Hazlett, together with their wives, to secure the payment of a promissory note executed by them to him for the sum of $12,000, with interest at ten per cent per annum, dated March 7, 1884, and payable March 7, 1885.

The plaintiff's petition, after setting forth the execution and delivery of the note and the execution, acknowledgment, delivery, and recording, of the mortgage, contained the statement that, "The defendants have not paid the

amount secured by the said mortgage, except the sum of $40 on March 24, 1884, and the sum of $1,791.15, April 9, 1884, and the further sum of $460 April 17, 1884; and there now remains due and unpaid thereon the sum of $13,564.47." (February 4, 1888.)

The defendants by their joint answer alleged as follows:

I. They admit that on March 7, 1884, the defendants L. W. Colby and Alfred Hazlett, made and delivered to the plaintiff their promissory note, as set out in plaintiff's petition, and that to secure the payment of the note, they, with the defendants Clara B. Colby and Libbie Hazlett, on the same day executed and delivered to the plaintiffs the mortgage deed in the plaintiff's petition described, which was duly recorded in the county clerk's office; that they have paid on said note, sums amounting to $2,291.15; that on or about March 15, 1884, said defendants, L. W. Colby, and Clara his wife, and Alfred Hazlett, and Libbie his wife, executed and delivered to the defendant William H. Kilpatrick, a warranty deed to the mortgaged premises, and that on January 15, 1885, the said Kilpatrick executed and delivered to the said Colby, a warranty deed to the mortgaged premises; and they deny each and every allegation in said petition except the matters and things expressly admitted.

II. That on March 7, 1884, at the time of the execution of the mortgage set forth in the plaintiff's petition, the plaintiff, William H. Reid, was indebted to the defendants L. W. Colby and Alfred Hazlett, in the sum of $5,000 for professional services and legal expenses in the prosecution of the State of Nebraska v. William H. Reid; that for the purpose of liquidating said indebtedness, and inducing the defendants Colby & Hazlett and William H. Kilpatrick to purchase said mortgaged premises, and a large amount of personal property in connection therewith, and to induce the defendant William H. Kilpatrick to advance money sufficient to pay the indebtedness

to Colby & Hazlett, and to pay other accounts of costs and indebtedness to other parties then required to be paid by the plaintiff, he represented and made the following statements in regard to the premises and personal property :

That he was the owner in fee of the mortgaged premises; that the same were free and clear of all liens and incumbrances; and that the same was in his possession; and that he had lawful authority to sell and convey the same, and deliver possession thereof; and that it was of the value of $14,000; and that he was the owner and was in possession of a large amount of personal property on said premises and had good right and lawful authority to sell the same, to wit: ten head of horses, twenty head of cows, thirty three-year-old steers, twenty two-year-old cattle, twelve yearling calves, sixty head of hogs, three lumber wagons, one spring wagon, two thousand bushels of corn in crib and field, three sets of double harness, one harvester, one corn planter, two harrows, one hay rake, three plows, one stove, one table and five chairs, and a large amount of household property, cooking utensils, and other personal property, of the value of $4,000. Whereas in fact the plaintiff was not the owner, nor was he in possession of said property, nor was it of the value of $4,000 ; that said plaintiff was the owner and in possession of only the following property, of the value not exceeding $1,000, to wit, ten hogs, ten cows, four horses, twelve two-year-olds, ten yearlings, two calves, one spring wagon, three plows, two sets of harness, one table, five chairs, one cook stove, six hundred bushels of corn; and said mortgaged premises were not in the plaintiff's possession, but were in the possession and control of James M. Reid, George Reid, William Reid, Sarah Plucknett, and others, who had liens upon and claimed to own and control the same; and there was also a large amount of taxes due, and a lien upon said premises, all of which the plaintiff well knew, and of which the defendants

Reid v. Colby.

had no knowledge whatsoever; that relying entirely upon said representations, and without having seen said property, the defendant agreed with the plaintiff as follows: To purchase said mortgaged premises and personal property so represented to be owned by plaintiff, at the sum of $16,000, the same to be conveyed to the defendants Colby & Hazlett and by them conveyed to the defendant William H. Kilpatrick, the compensation thereof to be as follows: $5,000 in attorneys' fees and expenses in full of the indebtedness of the plaintiff to Colby & Hazlett, and the balance of the $11,000 was to be placed in the shape of a note secured by a mortgage on said premises, due in one year. And it was also agreed that the further sum or sums amounting to $2,291.15 for costs, and other indebtedness of the plaintiff, should be paid from time to time as required, and the amount when so paid endorsed on the note of $11,000; that pursuant to said agreement, the plaintiff executed and delivered to the defendants, Colby & Hazlett, a warranty deed of said mortgaged premises, and the said defendants executed and delivered to William H. Kilpatrick their warranty deed of said premises, and a bill of sale of said personal property, and said W. H. Kilpatrick paid to Colby & Hazlett the sum of $4,000, and for costs and other indebtedness of the plaintiff, amounts aggregating $2,291.15, which were indorsed on the notes set forth in plaintiff's petition; that said Colby & Hazlett receipted said $5,000 indebtedness in full, and by a mistake in figuring executed and delivered the said note and mortgage described in plaintiffs' petition for $12,000, when the same should have been for $11,000, in accordance with the terms of said agreement; and after the execution and delivery of all the papers connected therewith, the defendants discovered said mistake in said note; and that thereafter the defendants learned for the first time that the plaintiff was not the owner and in possession of the said personal property and mortgaged premises purchased, and that the representations in regard thereto were

false; that the said James M. Reid and others were in possession of said personal property and premises under a lease and claim of ownership from the plaintiff, and on the 24th day of March, 1884, he brought suit in the district court against the defendant W. H. Kilpatrick, and others, and obtained an order enjoining and restraining said defendant from interfering with his possession and ownership in any way; that the defendant Kilpatrick brought an action in replevin in said district court against the said J. M. Reid and others, to recover the possession of the said personal property, but was unable to obtain but a small portion thereof; that afterwards by the consent of the plaintiff the matters in difference between James M. Reid and the plaintiff, and these defendants, were compromised and settled, whereby the said premises were left in the occupancy and possession of James M. Reid and the plaintiff's other children for the period of two years, whereby the defendants lost in the use and rents thereof, to the defendants' damage of the amount of $2,000, but the personal property received by and turned over to the defendants by plaintiff amounted in value only to the sum of $1,000, and was $3,000 less than that represented by the plaintiff as aforesaid; that the defendants necessarily expended large sums of money in costs and litigation in endeavoring to recover possession, and were put to great trouble, expense, and loss of time, in that behalf, to their damage in the sum of $1,500; that they paid the taxes on said premises for the years 1883 and 1884, amounting to the sum of $150, which were a lien upon said mortgaged premises, and which should have been paid by said plaintiff; that by reason thereof the defendants have been damaged and are entitled to recover of the plaintiff the sum of $6,650, which, with the mistake on said note and mortgage of $1,000, amounting to $7,650, the defendants are entitled to have deducted from and set off against the mortgage, note, and debt, sued upon in the plaintiff's petition; that the defendants have

requested the plaintiff at various times to make such deduction, which he has failed and refused to do; that the defendants have been ready and willing, ever since the maturity of said note to pay the amount after deducting the amount of the mistake and damages by reason of false representations of the plaintiff, and failure to comply with his agreement, and defendants offer to pay the same into court, and have held the same ever since subject to the order of the plaintiffs. The defendants say that the deed made by W. H. Kilpatrick to L. W. Colby, was made as a matter of convenience, by agreement with the defendant, and by reason of the damages growing out of the false representations of the plaintiff, and his failure to comply with his agreement which said Colby was interested for and liable equally with other defendants; with prayer that the said sum of $7,650 be deducted from the face of the note sued on, from date, and that the defendants be required to pay only the sum of $4,350, without interest, from the maturity of the note, in full satisfaction of said debt and for costs.

The plaintiff made reply denying each and every averment of new matter set up, and alleging that on March 7, 1884, the plaintiff and the defendants Colby & Hazlett accounted together and fully settled all matters concerning the legal services of said Colby & Hazlett and their expenses in the matter of the State of Nebraska v. William H. Reid, the plaintiff, and settled and assumed that the plaintiff should pay the defendants Colby & Hazlett the sum of $4,000, in full satisfaction of the same, and that said defendants then purchased. of the plaintiff the farm and premises described in the petition, at the sum of $14,000, and the personal property thereon at the value of $2,000, and made payment therefor by giving the plaintiff the note and mortgage mentioned, and in this way they agreed to and did deduct $4,000 from the purchase price of said property, and only paid the plaintiff therefor the

sum of $12,000 by giving a note and mortgage; and the plaintiff alleges that in consideration of the premises aforesaid, the defendants Colby & Hazlett agreed to get the plaintiff out of the state penitentiary of Nebraska within one year from March 7, 1884, which they wholly failed to do.

There was a trial to the court, with findings for the plaintiff and a judgment and decree of foreclosure in his favor for the sum of $13,896.84, from which the defendants bring the cause to this court by appeal.

It appears from the bill of exceptions, as well as by the criminal annals of Gage county, that sometime in the summer of 1882, the plaintiff, William H. Reid, was arrested on his farm in that county charged with the crime of murder, by administering poison to his wife, and was brought to trial therefor. At the first trial the jury failed to agree. In the second, he was convicted of a lesser degree of homicide, not shown by the bill of exceptions in this case, nor now accurately remembered. The plea and defense upon which he escaped the extreme penalty, was that of insanity. He was defended by the law firm of Colby & Hazlett, who not only defended him on his trial, but attended as attorneys to the preparation of his defense, procuring expert testimony in his behalf, and doubtless rendered him all the aid and assistance possible as friends as well as legal advisers. It also appears that during the time of his incarceration, Reid furnished them for the various purposes of his defense the sum of $800 in money.

It appears at the time of his arrest and commitment to jail, that he left in his house, on his farm, his six children, whom, in his deposition, he states to have been from six to nineteen or twenty years of age. He also had a brother-in-law, Bailey, who, with his family, resided in the vicinity of Reid's farm. There is but little testimony as to what care was taken of the house and farm of Reid during the nineteen months of his incarceration in the county jail, nor by

whom; but for aught that appears, the children remained there. It does appear from Reid's testimony that some short time before his second trial, at the close of his confinement in jail, he made a lease of the farm to his brother-in-law, Bailey, but that upon the lessee's attempting to enter into possession, he was resisted by the children of Reid, then occupying the house, and did not obtain possession, but in consequence of the opposition of Reid's sons, he relinquished it; that Colby & Hazlett, attorneys, drew up the lease from Reid to Bailey, and were cognizant of the circumstances, and of these facts.

It appears that upon the rendition of the verdict against Reid, which acquitted him of the crime of murder under the plea of insanity, his children conceived the idea of having him placed under guardianship to prevent any injudicious transfer of his property. This design of the children coming to the knowledge of Colby & Hazlett, they went to him in the jail in the evening, for the purpose of obtaining such a transfer of his property as would secure them their fees for legal services in defending him, and for money expended in his defense. It is probable, though not wholly certain, that Colby & Hazlett had previously obtained a promise more or less definite from the Kilpatrick brothers that they would purchase the Reid farm and personal property thereon.

The Kilpatricks were then absent from Gage county, one at Omaha and the other at Chicago. On the evening in question, Hazlett, for the firm of Colby & Hazlett, opened oral communication with J. D. Kilpatrick, at Omaha, by telephone.

According to Reid's testimony, he understood that the communications between Hazlett and Kilpatrick by telephone that evening were confined to the subject of advancing money by Kilpatrick to Colby & Hazlett, to enable them to take the property, and did not extend to the purchase of the property by the Kilpatricks. On the contrary,

it would seem from the testimony of Colby and Bates, as well as that of Hazlett himself, that it did comprehend the purchase of the property ultimately by the Kilpatricks; and that the deed from Reid to Colby & Hazlett, and the mortgage from them back to Reid, was solely in consequence of the absence of the Kilpatricks from Beatrice, and the necessity for an immediate transfer of the property before notice of the proceedings on the part of Reid's children should be served on him; and that the title to the land and property was taken by Colby & Hazlett really in trust for the Kilpatricks. This view of the case is deemed important by the defendants for the reason that if it be true, it lends some force to their contention that the trade was made on the part of the purchasers of the property. solely on the representations of Reid as to the amount and value of the personal property in the sale, as well as the situation and condition of the farm in respect to its occupancy, it being conceded that the Kilpatricks were without other information or knowledge of the property and of its value and condition. I do not, however, attach great importance to it. For, in view of all the circumstances, I think that whatever view may be taken, whether Colby & Hazlett bought the property, themselves, with or without the intention or expectation of turning the same over to the Kilpatricks, upon terms more or less understood or subject to future negotiations, the defendants in this case are chargeable with all the knowledge or notice that Colby & Hazlett, or either of them, possessed, of the situation or value of the property which was the subject of the sale. They knew that Reid had been forcibly taken away from his farm and property nearly two years before, and during all that time had been imprisoned, and that all or nearly all of his communications with the world had been received through them. They knew far better than he whether the stock and other property left upon the farm at the time of his arrest had been preserved and kept intact;

what increase, if any, had occurred; and generally, its situation and condition. There appears, in the bill of exceptions, a list of this property; and there is some evidence that it was made at the dictation of Reid, there, that night. But this testimony is far from conclusive; and even if true, such a list, at that time, and under the circumstances, must have been understood by them as accompanied by all the qualifications and exceptions connected with the situation. All agree that the estimated value of the farm was $14,000, and whatever value may have been put upon the personal property by Reid, or whatever number of steers may have been represented by him to be on the place, or whatever quantity of corn may have been there, no one claims that the united value of the farm and the personalty was fixed at a greater sum than $16,000, thus fixing the value of the personal property at $2,000. No witness has fixed the value of the personal property actually received by defendants at less than that sum. It seems that after the property was transferred by Colby & Hazlett to Kilpatrick, Reid's children disputed his right to take possession of it, and he sued out a writ of replevin and replevied the same from them; and the several appraisers in this action fixed the value of the personal property at $3,544; and while defendants, in their testimony, make it pretty clear that they failed to obtain possession of nearly all the property which Reid represented to be on the place at the time of the sale, or that they had reason to believe was on the place at the time of the sale, yet no witness testifies that the personal property actually reduced to possession by defendants was of less value than $2,000. That was all that Reid realized for it in the transaction; and unless it is believed that under the circumstances the defendants had a right to rely upon the knowledge or judgment of Reid as to the amount and value and kind of property remaining on the farm during his enforced absence of nearly two years, and shut their eyes to their own knowledge of the same facts

and circumstances with their vastly superior means of information and judgment, defendants cannot be permitted to profit by any mistake, misinformation, or error of judgment, on the part of the plaintiff.

I come to the conclusion, therefore, that defendants can take nothing by this second defense and counter-claim, which, as they express it in the brief, is that there was not the amount of personal property on the farm represented to be at the time of the sale by at least the value of $2,000. Before passing upon this branch of the case, I will call attention to the fact that the bill of exceptions contains a copy of the deed or bill of sale from William H. Reid to L. W. Colby and Alfred Hazlett, dated March 7, 1884, acknowledged before Charles O. Bates, notary public, whereby for the express consideration of $2,000 the said Reid grants, bargains, and sells, to said Colby & Hazlett the identical personal property hereinbefore mentioned by the following description, to wit: ten head of horses; about fifty or sixty head of cows, calves, and steers, and all my personal property of every description, consisting of stock, wagons, buggies, agricultural implements, household furniture, harness, cattle, horses, hogs, and other personal property of every description, kind, and nature, on the farm formerly owned by me, and so forth. And this indefinite and duplex description of his personal property was probably the only one which he would undertake to give, or which the defendants considered it worth while to take at the time. By this description in his deed or bill of sale, he warranted to defend the sale of said property and goods and chattels, and by that description alone do I think him legally bound.

The taxes on the farm for 1883 were a lien upon the same at the date of the deed from Reid to Colby & Hazlett, and being an incumbrance warranted against by the deed, and having been redeemed by defendant Kilpatrick by the payment in redemption thereof of $44.03, on

the 4th day of February, 1885, defendants are entitled to that sum to be credited as of that date upon the note and mortgage described in the petition.

Defendants also claim an allowance for the taxes of 1884; but the conveyance having been made prior to April 1 of that year, the same were not a lien upon the land while owned by the plaintiff. The statute (sec. 138, chap. 77, Comp. Stat.) providing that "The taxes assessed on real property shall be a lien thereon from and including the first day of April in the year in which they are levied until the same are paid," their claim for these taxes cannot be allowed.

As to the damages claimed by defendants on account of not being able to obtain possession of the farm without expense, delay, and trouble, it will be sufficient to say that it is deemed to be inadmissible. Reid warranted the title in and to the real estate to them. Any damages to them legally arising from a breach of the covenants of the deed would no doubt form the ground of a counter-claim, or set-off, as in the case of the taxes referred to. And it may be admitted as a general proposition that it is the duty of the vendor of land to place his vendee in possession; but in this case it was not demanded nor expected of Reid, and defendants contracted with him and accepted of their conveyance from a vendor whom they knew to be utterly without power to go out upon his own land, or to put his vendee in possession.

This brings us to the consideration of the first point discussed by counsel in the brief: the claim of defendants, as set up in their answer, that in the drafting of the note and the mortgage by Colby & Hazlett to the plaintiff, by mistake and error of the draftsman, the sums were made for $1,000 more than should have been, and more than intended to be.

It is assumed by counsel on either side, in the briefs, that this claim was disallowed by the trial court on finding the

31

amount due to the plaintiff on the note and mortgage, and in its rendition of judgment thereon.   If upon the presentation of this question to the trial court there was a mere conflict of testimony, then it must be admitted that under the law (as often announced by this as well as other courts) the findings of the court below, unless clearly wrong, will not be disturbed.   And it may also be admitted that our examination of the bill of exceptions shows that the weight of testimony is largely in favor of the claim of the defendants that there was a mistake of $1,000 in the amount as drafted in the note and recited in the mortgage.   The defendant L. W. Colby, in his examination as a witness, stated that " We had a meeting with Reid for a settlement, and I had Mr. Bates make out a statement of the account between us for costs and expenses, and money advanced, and it amounted to something over $5,000, the balance due after giving him credit for money he had paid ; he paid some money ; he had advanced and paid us $150 at one time, and $500, making $800 in all.   Our account at that time, against him, amounted to $6,134.30, and after deducting the $800 balance, the account amounted to $5,334.30. *   *   *   There was no thought of Colby & Hazlett buying it.   The only thing they were to have was $5,000, their fees and costs advanced."   *   *   *

The witness further stated that the Kilpatricks were to take the property of Reid ; that they were to advance the money coming to Colby & Hazlett then, the balance to be secured on the land ; but they not being present, and in consequence of the proceedings of Reid's children, it was necessary that the conveyance be made to Colby & Hazlett as formerly stated.

"He [Kilpatrick] wanted to know how much money was needed—wanted to know if we couldn't take less than $5,000 in cash, and have the balance on time.   Hazlett, I think, did the telephoning, although I did some of it. Hazlett says: 'I think we can get along with $4,000 cash,

and you can pay the costs as you have to pay them.' Then we talked with Reid again, and the arrangement was then made, as Kilpatrick was not there, to give a mortgage back on the premises. It should be deeded to Colby & Hazlett, and the personal property assigned to Colby & Hazlett, the whole business for $16,000; and Colby & Hazlett should on the return of the Kilpatricks turn it all over to them on the same terms. In other words, Colby & Hazlett were the *go-betweens*. We didn't purchase the property, and didn't claim to. Our only interest was the $4,000 cash coming to us; so we then made that arrangement; and I had some other business, or something of the kind, and Hazlett and Bates fixed up the papers. I think Bates fixed up the papers, and, in some way or other, instead of making the mortgage for $11,000, after taking out our $5,000, the mortgage was given W. H. Reid for $12,000; and I presume that mistake was made by making the $1,000 difference by cash, by telephone. We fixed out the papers that night. I think the bill of sale was made by Reid in blank that night, and I think the deeds were made and filled out, and I signed, and my wife, and Hazlett, and mortgaged the thing for $12,000, when it should have been for $11,000; and I gave it to Reid, and we filed the papers. I think we gave it to the clerk that night, and the notice of guardianship was served on Reid the next morning. I didn't discover the discrepancy in the mortgage until quite a number of days afterwards; then we couldn't explain it. When we came to fix up with the Kilpatricks, they paid us over the $4,000, and we took Kilpatricks for our share of the fees, and gave him a receipt in full. * * * This is the receipt that was given Reid that night, on the date that it bears:

"'BEATRICE, NEB., March 7, 1884.

"'Received of William H. Reid the sum of $5,000, in full satisfaction and payment of all claims and damages against him for legal services and expenses up to date in the case

of State of Nebraska v. W. H. Reid, and in full of all fees for services hereinafter rendered by us in and about said case.    [Signed]    .    L. W. COLBY,

"'ALFRED HAZLETT.

. "'*Of and composing the firm of Colby & Hazlett.*'

"We took Kilpatrick for $5,000, and by a mistake the mortgage was made for $12,000 instead of $11,000, which it should have been. I took the papers, and being in a hurry, for we didn't want a guardian appointed over this land before we got our money out of it, we only received $4,000. We have never since received the other, and the $1,000 which we should have received, and which it is agreed we should receive—with Reid—was included in the $12,000-note in this case, which should have been for $11,000. I will state this: we presented our bill to Reid, an itemized statement of all expenses; it was all agreed to, and no objection made to it; and Reid expressed himself . perfectly satisfied with the amount, and with our services in the matter, too."

On cross-examination, the witness testified as follows:

Q. State in whose handwriting that receipt is?

A. The body is mine, and the signatures are Hazlett's and mine.

Q. That was the paper you gave Reid at that time?

A. Yes.

Q. It is not signed by him?

A. No.

Q. It was prepared where?

A. Right there in the jail.

Q. This business was done in the jail in the night?

A. Yes.

Q. You were present when your wife signed?

A. I don't remember whether I was or not. I think I took the deed down there and got her to sign it myself— the mortgage. I think she didn't read it over. She always signs whatever I want her to.

Q. You told her it was all right?

A. I did; I never read it over, to my knowledge.

Q. Do you mean to say that, lawyer as you are, you signed a mortgage that you even supposed was for $11,000, without reading it?

A. I have no doubt of it. It was prepared by Bates, and I am always willing to sign anything he gets up, even with my eyes open.

Q. You don't know whether you read it or not?

A. I know very well I didn't read it at all. If I did, it would be an unusual thing for me.

Q. Is it not true that you had a settlement of the matter between you and Reid?

A. Yes.

Q. Of how many did the firm of Colby & Hazlett consist, when you made that settlement? How many of you were there?

A. I think I went to the depot and got into conversation with Sarah Bailey and her husband. I think I was there a portion of the time, and a portion was not. I don't think I was there when the papers were drawn up.

Q. Was Hazlett there?

A. I think he was, and Bates.

Q. Bates was a member of the firm?

A. I cannot recollect. He was there, a member or employé of the firm. I cannot remember now whether he was a member, at that time, or not.

Q. You had just defended Reid in a state case, and your defense was insanity or feeble mind?

A. Insanity, and not feeble minded in matters of business.

Q. You mean to say that an insane man, like Reid, beat all three of the members of Colby & Hazlett in the settlement that night?

A. No; I think it was a mistake. He may have seen it, and he may not; although he is a quick, business man —few better, that I ever met.

Q. In whose handwriting is the note and mortgage?

A. In Mr. Bates's.

Q. And they are both signed by you and Alfred Hazlett?

A. Yes, and our wives.

Q. Now then, the note and mortgage written at $12,000 passed through the hands of Mr. Bates, and through yours and Mr. Hazlett's hands without either of you discovering there was a mistake of $1,000 in writing it?

A. Yes.

Q. And Bates knew that the mortgage should have been written for $11,000 and drew it for $12,000?

A. I don't know whether he knew that or not. I would state that the mistake came from telephoning to Kilpatrick, in which he asked if $4,000 would not do instead of $5,000.   *   *   *

Q. Did you have any talk with Hazlett and Bates, immediately after the execution of these papers, about the mistake?

A. I did.

Q. I only want to get you to point out the time.

A. I cannot tell the time.

Q. Was it before or after your deed to Kilpatrick?

A. I think it was before and at the time. I think we talked it over two or three times.

Q. So on the 19th of March you knew all about the mistake?

A. The 19th day of March?

Q. Yes.

A. Well, I undoubtedly did long before that.

Q. Say in whose handwriting this letter is?

A. In mine.

[The plaintiff's attorney here offered in evidence a letter of the witness to the plaintiff, identified as exhibit " E."]

By the witness: Yes; I think I sent that letter.

Exhibit " E" is a letter dated Wymore, Neb., March 19,

1884, addressed to William H. Reid, Esq., Lincoln, Neb., and signed L. W. Colby. It opens as a social and friendly communication, but soon passes to an account of the difficulties encountered by the Kilpatricks, to whom they had sold the real and personal property, in their endeavor to obtain possession of it, as the boys had run off part of it; that James Reid had brought an injunction suit against Colby & Hazlett, claiming to be the heir at law of his father, who was unable to transact business by reason of *insanity*, and so forth; of the writer's unsuccessful attempts to make the proper arrangements with the minor children; that the county commissioners had refused the allowance of fees and mileage of Iowa witnesses at the recent trial, which helped Reid considerably; and asking his authority to settle up the fees taxed against him in the recent trial, if it could be done for $1,700, inclosing a blank warrant for such authority and settlement; informing him that the Baileys were still on the place, but that he was making arrangements to move them to town soon; stating that the writer was in Lincoln the last week, but was too busy to get out to the prison to see Reid, and that he might be up again soon, and expressing the wish that Reid would write him fully, giving his ideas, suggestions, and desires, and expressing his own belief that things would work out right in a short time, and closing with the expression that "we will do our part." *  *  *

By the court: Did you call Reid's attention to the mistake of $1,000?

A. Yes.

Q. When?

A. I don't remember the exact dates. I talked with him a number of times.

Q. State the times as near as you can?

A. I think at the time I went up there. *  *  *  I spent a day up there at which I talked the whole business over with him. It was probably along in March.

Q. Before or after the letter of the 19th?

A. It was after that undoubtedly.

Q. When was Reid taken to the penitentiary?

A. I cannot state, but I should think about the 8th or 9th of March. I think these papers were served on him before.

Q. How long after the papers dated March 7th?

A. The next day.

Q. And he has been in the penitentiary ever since?

A. Yes.

Q. What did he say about the mistake?

A. He said he didn't know, "do you think so?" I told him there was no question about it. "Well," he says, "we have got to get money matters paid up, and we will see about it," in an indefinite sort of a way. He never admitted it was a mistake.

Q. Did you deed to Kilpatricks on the 19th of March?

A. I think the 14th or 15th.

Q. Was there anything said to them about the mistake?

A. There was talk about it at the time; talk between Hazlett, Bates, myself, and Kilpatricks. Of course we could not get our $1,000 out of them.

Q. Did that deed make any reference to the mortgage?

A. Yes; the deed recited about the $12,000 business. In other words, we turned it over just as we received it.

The witness having left the stand, was recalled, and made a further statement in reference to his present interest in the property; after which he was cross-examined by counsel for plaintiff as follows:

Q. Why didn't you say something about the $1,000 in your letter?

A. The reason was that I had talked that portion of it over before with him, and I was particular to state rather fully in all my letters to Mr. Reid, because he had a habit of forgetting all I had said before.

Q. Why didn't you say something to him in the letter wrote him on the 19th of March, 1884, about the $1,000?

A. I don't remember why I didn't. I might not have told him a good many things.

C. O. Bates, a witness for the defendants, testified that he was present on the night of March 7, 1884; that he drew up some papers there, fixing up some debts, mortgages, and so on, between the parties. After stating the efforts made by himself, on the part of Colby & Hazlett, to assist Reid in raising money to pay their fees and expenses incurred in his defense, by mortgaging his farm, or in some other way, he further stated that "We told Reid we would see if Kilpatrick could not take the place; and the question of the value was discussed, and he valued it at $35 or $40 per acre; I think $40 at first, but finally agreed to take $35. He said there was a lot of personal property on the place that he owned at that time; he gave us a list of the personal property that night, at the jail, and it was taken down there. The list that Mr. Colby has read here, is the list that he gave us, and claimed that it was worth $4,000; but he would take $2,000. I had not talked before of the arrangement with either of the Kilpatricks, although I heard one side of the telephone conversation between Hazlett and J. D. Kilpatrick, who was then at Omaha; but we didn't know which one of the Kilpatricks would buy it. He objected to paying as much money down as we wanted, and I heard Hazlett say at the telephone that $4,000 would do. Of course I don't know what the other side of the conversation was. That was the day before, if I recollect right—the day before the evening we were at the jail. Colby & Hazlett had several conversations with him, I suppose, but I did not hear them; but finally, that evening, when the papers were fixed up, we drew a bill of sale of the personal property, a deed from William H. Reid to Colby & Hazlett, and a mortgage from Colby & Hazlett back for $12,000. These were all signed, and I acknowledged them there." That witness had the itemized statement of the bill of Colby

& Hazlett there at that time; it was put down there that evening and figured up, amounting to $6,134.30, as rendered to Reid. The witness says: "I will state here that this included our attorneys' fees, our money we had paid out for various causes in the defense of the case. Reid looked it over and the amount was satisfactory to him, and it was agreed upon that that was the amount. He had paid us $800 at different times, leaving a balance due of $5,334.30 owing by W. H. Reid to Colby & Hazlett, and it was settled by his agreeing to pay $5,000. It was taken in round numbers at $5,000. At that time the understanding between us was that Kilpatricks were to take the place and pay the $5,000, and give a mortgage back for the balance. I don't know and cannot tell, myself, now, how that mortgage was ever made for $12,000. I drew up the mortgage as I have testified, and it was signed; but it was undoubtedly—and there are indications that it was—an error, because the talk and agreement between us was that we were to have $5,000 in cash, in full of our bill, and the mortgage given back on the place should have been only for $11,000. How it was made for $12,000 I don't know, now; I know this, further, that in my conversation with Mr. Reid before the signing, and at the time, that $11,000 was talked of."

After the witness had continued his testimony upon the other branch of the case, at considerable length, his examination proceeded as follows:

Q. Do you remember when the first talk was after the discovery of the mistake in the mortgage?

A. I do not; but it was not a very long time. My recollection is that it was after the transfer was made; but would not be sure about that. I know I began to look around for the other $1,000; that is the first I had noticed the deed, and I think you (Colby & Hazlett) went down to ask the Kilpatricks about it at the time; but it could not have been long either before or after the transfer was made.

I know as soon as they came home they paid us the $4,000, but when the error was finally discovered I don't know, now. I know I immediately called Colby's attention to it, and Colby thought that Reid would fix it up as soon as he discovered it.

By the court: When were the note and mortgage delivered to Reid?

A. That night, March 7, right in the jail. I think Colby took it out, and he and his wife signed it, and I went with him, and Hazlett the same.

Q. When was it recorded?

A. The next day, the 8th.

Cross-examined by Mr. Hardy:

Q. Who got Reid's mortgage recorded?

A. I cannot tell.

Q. Who did he give it to that night?

A. I cannot tell; my recollection is that he gave it to me, but would not be positive.

Q. You knew that you drew the note and mortgage for $12,000, didn't you?

A. I suppose I must have known it.

Q. You knew it all the time, and all the way along, and you don't think, now, that it occurred to you there was a mistake made, until after you had deeded to Kilpatrick?

A. I think this——

Q. Do you think that?

A. I will answer in my own way: I think the change of that amount we were to be paid, at that time, from $5,000 to $4,000.—I think in figuring in the jail that the change of that amount we were to be paid, in cash, from five to four thousand dollars—I think, in figuring, and I have no doubt of it.

Q. You are not apt to forget small sums of one thousand dollars when they are coming to you?

A. Not usually.

Q. That is the first time it ever occurred to the firm of Colby & Hazlett?

A. I cannot state whether it is or not.

Q. Can you name any other case where it occurred?

A. Not now, no.

Q. Now, Mr. Bates, you say you knew—

A. I desire to say this, Mr. Hardy,—

Q. Answer my question. You say that the note and mortgage were drawn for $12,000, and you knew it; now tell me why it is if you knew it that you didn't discover there was a mistake until after Colby & Hazlett had deeded to Kilpatrick; or is that true?

A. I didn't fix the time when I discovered it. I don't remember; the night these papers were drawn up, it was quite late before it was finished; we were in a great hurry, because we were afraid matters would be tangled up. * *

Q. Now you settled with Reid that night?

A. We agreed on the amount due us, yes.

Q. And is it not true you compromised the matter at $4,000?

A. No, sir.

Q. Is it not true that the members of your firm have stated in town that the amount of $4,000 you agreed to take and receipt for?

A. If he has stated it he is mistaken.

Q. He was interested and was there; Hazlett was interested and was there?

A. Part of the time.

Q. And you were there part of the time?

A. I was there all that time.

Q. Colby was there all the time?

A. I think that we, all of us, went out at times. Colby was away part of the time, and I was away part of the time, and Hazlett was away part of the time.

The defendant, Alfred Hazlett, testified for defendants, that he remembered the transfer of property between

plaintiff and the defendants; was present when a portion of the papers were signed; desired to state that it was a good, long while ago; that he never had recalled the circumstances to any extent with the exception of looking over a few of the exhibits introduced in the case heretofore, and that his recollection of the matter was about this: that after the old gentleman was sentenced by the court, knowing the situation of affairs to some extent and the feeling of his children toward him, Colby & Hazlett felt somewhat anxious to have their attorneys' fees fixed up, that they might feel safe, as they had been to considerable expense and outlay. They had advanced large sums of money for him; thought it was away after the first week of the term when he was tried; that Bates had checked quite heavily on their bank account and they did not want it to rest in that way, and were particularly anxious to have it fixed up, so they might be safe when he was sent to the penitentiary; thought that Colby and witness, and perhaps Bates, went up to see him in the county jail, and had a talk with Reid about closing up their affairs; did not think they closed it when they first saw him, as there was considerable to talk over, but thought they went back the second time; not positive as to that; that Bates was with them at the time they closed up; that they made out a statement of what he was owing and of what defendants had advanced, making out a bill for Reid; could not give the exact amount of bill without referring to their books, but to the best of witness's recollection the amount was over $6,000 for money expended and fees. The witness was further examined as follows:

Q. Do you remember the first amount agreed upon between Colby and Reid? If so, give it.

A. I think it was $5,000. * * *

Q. State if there was any agreement or arrangement between Reid and us that we were buying it—that we were taking the property.

A. Of course we were taking the property—the title —in our names; but he certainly knew that Kilpatrick was to take it, and furthermore I would not have given—the firm would not have taken this property, unless Kilpatrick would have consented to take it off our hands.

Q. State what was said by Reid, and whether he knew of the arrangement with Kilpatrick to take the property?

A. He certainly knew all of that. I told him myself about the Kilpatricks, and furthermore told him I would not accept the proposition he had made until we had heard from Kilpatricks. ·

Q. Now you can state how it came that the mortgage was given for $12,000. What was the agreement with regard to the mortgage, and our fees, and where were we to get our fees?

A. I don't know, unless it happened in this way: my recollection is, that we were to give $4,000—that is, the personal property was to be taken in at the rate of $4,000, as represented to us by him. That is as to the amount of personal property, and I think the real estate was to be taken in at $12,000.

Q. And our fees were how much?

A. We were to allow him at the rate of $12,000. *  *

Q. How much was Reid to get after the payment of our fees, and how much was our fees; how much was deducted from the $16,000?

A. My recollection is, that we discounted some. There was a little objection on his part; he thought it a little extravagant in some respects—it is not necessary to mention here—but my recollection is, that we agreed on $5,000, for fees, and when we saw the Kilpatricks, they did not want to advance that much money and assume the mortgage; and we got $4,000 out of them.

Q. State how it happened we made the mortgage read for $12,000.

A. Well, sir, I don't know. I cannot account for that,

unless it was a mistake on the part of Bates. I know it was spoken of afterwards, and I know I did not authorize it. * * *

Cross-examined by Mr. Hardy:

Q. You have been Reid's attorney in the prosecution of the state against him?

A. Yes.

Q. And all this matter of the settlement grew out of that case?

A. Yes, sir.

Q. Do you remember as to who was there all the time these papers were made out that night?

A. I don't know, outside of ourselves; there may have been other prisoners in there.

Q. It was done in the night?

A. The closing up part of it was.

Q. I understand the first time you were up there, you made no arrangements?

A. The business transaction was all talked over, no doubt.

Q. But he found fault with the amount of your fees?

A. No; as to our fees, I don't think he objected to that.

Q. The amount of your bill?

A. Yes; he thought the bill a little extravagant in some regards; I think he did. He asked us if we couldn't make our fees less, in order to do the fair thing with him.
* * * * * *

Q. Do you remember a week ago Saturday evening, at the foot of your stairs, having a conversation with me in the presence of Mr. Saunders?

A. Yes, sir; I had such conversation.

Q. Was Mr. Saunders there?

A. Yes, he was; I don't know whether he was there, or Mr. Lahamie.

Q. Did you state there that your bill was compromised with Reid at $4,000?

A. I don't think I did, Mr. Hardy; am quite confident I didn't, because I didn't know at that time.

Q. And add, "If there was anything in this matter, it was in the personal property"?

A. No, I told you this —

Q. The question is whether you said that or not?

A. I am quite confident that we did not compromise at $4,000; but the old man was keen enough to beat us out of about $2,000 in personal property.

Q. Then you would not attempt to be entirely positive that you didn't agree, Mr. Hazlett?

A. I would be for this reason, that I didn't know at that time. I had never looked at the papers and never read the pleadings over; I cared so little about it I did not know.

Q. I understand you to say you had forgotten about it until you had read over the exhibits?

A. Yes, sir.

Q. And your recollection is based now on the exhibits?

A. Yes, and our books, and to a great extent in rehearsing and running the matter over in my mind.

Q. Talking it over with Mr. Colby and Mr. Bates?

A. I have not talked with Mr. Bates about it; Colby came in for the exhibits, and I talked with him this morning coming up with reference to the matter.

Q. The consideration for that farm was expressed in the deed of conveyance to you, wasn't it, from Mr. Reid?

A. Well, sir, I don't know.

Q. What I wanted to know was whether the consideration you was to give for the farm was expressed in the deed for the farm?

A. Well, I don't know, Mr. Hardy.

Q. There was a bill of sale made for the personal property?

A. Yes, sir.

Q. And it was talked over, wasn't it, as to how much

the farm would be, and how much the personal property would be?

A. Yes, sir.

Q. Don't you know that the personal property was put at $2,000, and so written in the bill of sale?

A. No, I think not; I think not; I think we agreed to give $16,000 for the whole thing.

Q. You saw that bill of sale before you closed up your business; the bill of sale was made and signed by Mr. Reid, and you saw it?

A. I don't know as I did; we trusted to Mr. Bates to make up the papers and comply with our contract. I may have seen it, but it is doubtful.

Q. He made up the papers to comply with your contract?

A. He was told to, and I may have made up the papers myself; I don't remember now; I don't know whose handwriting they were made in.

Q. You evidently saw the note and mortgage before you signed it?

A. I should think I would; I ought to have seen it.

Q. You don't mean to say that you as a business man signed a note for $12,000 when the agreement was that you were only to sign for only $11,000?

A. I will tell you in answer to that—

Q. Just answer the ordinary way that other witnesses would.

A. Not if I knew it at the time.

Q. Not if you knew it, you would not be apt to do it?

A. No.

Q. The note was written in Bates's handwriting?

A. I could not say; I presume so.

Q. There was a compromise of some kind between your firm and Reid?

A. Yes.

Q. And Bates was a member of the firm?

A. No; well, he was in one respect.

32

Q. Not publicly; but he shared in the profits, didn't he?

A. Well, we had a private understanding with him; he was to have a certain share of the net profits.

Q. How long after the note and mortgage was given before it was ascertained there was a mistake?

A. I could not say; I know it was talked of after the papers were executed.    *    *    *

Q. Isn't it a fact that you did not understand that your bill to Mr. Kilpatrick was about $4,000 till you looked over the exhibits in this case and the figures; that you didn't know it was about $4,000, the amount agreed upon?

A. I am rather inclined to think I always knew that Kilpatrick gave us $4,000, and we turned over the papers.

Q. Isn't it, as a matter of fact, that this $4,000 was to be your fee in the Reid case, and Reid was to pay out of the note and mortgage the costs in the case, and to pay the Bailey note of $500?

A. I don't remember the Bailey note, nor the arrangements as to the costs, or anything of the kind.

Q. Now in your estimate of $5,000 you included the costs, didn't you?

By the court: Included in what?

By Mr. Hardy: In the estimate presented to Reid for $5,000.

A. I don't know now, really. Didn't he pay his own costs? My recollection is that Reid paid the costs.

Q. It was paid out of the note?

A. Out of what note?

Q. The note of $12,000. You were to pay the costs and have it indorsed on the note.

A. No, I don't remember any such conversation about that; I don't remember who was to pay it, or how it was done; when I got through with my transaction I quit.

J. D. Kilpatrick, a witness for the defendants, testified that about the time this purchase was made he was in Omaha, and was called to the telephone by Alfred Hazlett.

He solicited the purchasing of the farm and property by us as a matter of accommodation to the attorneys in the case and to Reid.   We did not want the property, though we were buying cattle and young stock.  Hazlett stated that the matter had to be decided quickly, and was anxious we should assist them, and represented that the young stock and cattle that would be turned over would make the transaction a safe one — one there could be no money lost in. Witness objected to the price of the land named, which was explained by Hazlett giving me a list of cattle and horses and young stock that was going into the transaction. He represented that Reid was very anxious that this should be consummated; the costs and attorneys' fees he wished to pay, and it would have to be done at once if done at all, and without me personally looking into the matter or knowing anything about it.   Therefore I had to take the representations of Hazlett about what we were buying, and consented to the carrying out of the agreement in substance when I returned to Beatrice.

Q. Do you remember what statement he made, if anything?

A. On my return a few days afterwards, the amount of money then required was paid over, as stipulated, $4,000, cash, with the agreement to pay the amount of costs, when decided what they were to be, and the amount to be indorsed on the note as part payment, and the property and farm to be turned over.   This, in a short time, was shown to be a mistake; the farm was in the hands of Reid's family, located on the place, who had charge of the cattle and stock and the farm.   We acted about as requested by the attorneys and Reid in trying to get possession and in trying to get the stock, and went to the farm thirty days later. It was time the crops should be put in.   Witness was given to understand that it was the desire of Reid that an arrangement should be made by which the family could be retained on the place and the children kept together.   The

place was leased to the sons of Reid. Witness then undertook to be let out of the whole transaction, asked it and thought he was entitled to that, but failed here with Hazlett & Colby; went to Lincoln and saw Reid; told him what money we had advanced on the place, and the disposition that was made of the place; asked him to take the place back and give us a mortgage for four or five years, at a reasonable rate of interest, for the money we had actually paid; not but that we would pay him for the property, the stock we had taken from the place, whatever it was said they were worth. He said he was satisfied as the matter stood; that he had his mortgage and the place was leased; and so the matter went on, and finally Mr. Colby consented to take the place back.

Q. State how much, as represented by Hazlett, his personal property was worth.

A. The list of personal property that Hazlett quoted to me, or represented to me when I got back, would be worth not less than $4,000; there was not less than thirty three-year-old steers, and grain, etc., that never materialized, or turned over.

Q. How much corn did you get?

A. Five or six hundred bushels.

Q. What would the steers have been worth, if you had got them?

A. From thirty to thirty-five dollars a head.

Q. What was corn worth at that time?

A. About thirty cents a bushel.

By the court: You never talked with Reid until after the transaction?

A. No, not until that time I went up to see him at the penitentiary.

By Mr. Colby: State how much rental of the place you got after it was rented for the two years to the Reid boys.

A. From five to six hundred dollars; I think it was about three hundred dollars a year.

Q. State what the premises would have brought; what been worth if rented so you could have received and had full advantage of the place during these two years.

A. That would be altogether on how it is carried on. It is a good farm of 400 acres of nice land. If tilled well, would produce well. It was left in weeds and in very bad condition ; there would be a material difference in the way it was looked after. I think there will be farmers close by that know the land well that can estimate about that better than I can.     *     *     *

Q. You had no idea of buying this place until you were called to the telephone in Omaha by Hazlett?

A. No, I had no thought on the matter at all.  ·

Q. I understand you to say that what you did was largely to accommodate the firm of Colby & Hazlett, to let them out?

A. It was wholly with that intention.

Q. How long were they talking at the telephone?

A. Not long; but long enough to give an idea of the character of the land, and the number of head of stock, etc.; that it was a good farm, worth thirty-five dollars an acre, situate four or five miles from DeWitt. He impressed on me the necessity of having a decision, and I said enough so that he would calculate on it, that we would accept the trade on those conditions.

Q. You had not seen the farm, nor Reid, who you knew was about to go to the penitentiary?

A. No, I had not seen Reid, nor the farm, and I knew the circumstances, but did not think upon the fact that he had been kept away from the farm; but I should have known.

Q. That is where he could not have known, and I understand you that Hazlett told you their fees were $4,000, and advances?

A. No, Hazlett asked me for $5,000 cash, and I asked him if a less amount would not answer just at that time. .

I was in Omaha at that time engaged in a settlement; I asked him because it was a necessity; if I told him I would pay a certain amount of money, I must know.

Q. Didn't you testify on direct examination that he asked you for $4,000?

A. No; I think I said I paid when I came home, over $4,000.    No, he asked me $5,000.

Q. He told you there had got to be costs paid?

A. He told me $5,000 cash; that is the way he put it to me, and thought after a while when it was found just what it would be—Reid wanted the costs paid or provided for, and that they would be some large amount, not knowing definitely what they would be.    He asked for $5,000, and I asked if $4000 would not do, and he said it would. He gave me to understand that by paying $4,000 we would fix it up.

Q. He didn't tell you how much was going to the firm of Colby & Hazlett?

A. I didn't pretend to know anything about that, nor their arrangement for fees at that time.    All I know about that I have heard since that time.

Q. When you went to the penitentiary to see Reid, Hazlett went with you?

A. Yes.

Q. And you were present afterwards, on July 31, 1885, when Hazlett wrote Reid?    Your proposition was to have Reid take the farm back at $40 an acre?

A. No, I talked with Reid; I asked him to take the farm back on the same conditions I bought it, and I offered to turn the farm over to Colby & Hazlett for $500 less than I paid for it.    *    *    *

Q. You never saw any of the property on this farm until you bought it?

A. No.

Q. Neither you nor your brother went up to see it before you had the deed from Colby & Hazlett?

A. I think not. My recollection is I committed myself in Omaha.

Q. You don't pretend to say that you in Omaha had agreed to buy $16,000 worth of property you never saw, solely upon the word of Hazlett?

A. His representation; yes, I did that, I will acknowledge.

By the court: Did any of you look at the property before you paid the money and took the deed?

A. No, my recollection is that we did not. There was a hurry to get this thing fixed up, and we had both Hazlett and Colby—both had agreed with us we should lose nothing; that was only a temporary emergency to be met and it would be a great accommodation, and there would be no loss. They represented everything as being amply worth what had been paid for it, and we would sustain no loss in doing that, and do them a great accommodation, and so on, and it was accepted.

Q. I would like to ask what this personal property was worth?

A. I don't think we got to exceed $1,500 worth of property.

By Mr. Hardy: I will ask you what that place at that time was worth?

A. I would have valued the farm at $30 an acre at that time. It was a lump trade. I didn't consider what we called the farm, so the aggregate was the same.

Q. What were you told about the improvements?

A. That it was a good, new, farm house, insured for $1,000, with 200 acres broken on the farm.

Q. And the whole business went over in five minutes back and forth?

A. Yes, I think we did it in five minutes.

The deposition of William H. Reid, the plaintiff, taken at the penitentiary, was read in evidence on the trial. So much of it is copied as relates to the point under consideration:

Q. State whether or not the defendants Colby & Hazlett rendered any professional services for you prior to March, 1884?

A. They attended to my case as my attorneys.

Q. State whether on or about March 7, 1884, you had a settlement with them as your attorneys for their fees and disbursements?

A. We had a settlement.

Q. State what you settled, and how you settled.

A. Fees, expenses, and costs, as I understood it at the time. I sold them what property I had for $16,000, and I was to give them $4,000 out of the sale for their fees, expenses, and costs, as I understood it, in my case.

Q. State how much the farm was sold for, and how many acres were in the farm?

A. Four hundred acres; price was $14,000.

Q. State what was said between you and them about the price of the farm, and in regard to its value?

A. Don't know as I can tell what was said about the value. The price was agreed upon.

Q. At how much?

A. At $16,000 for my land and personal property.

Q. State how much they were to pay you for the land, and how much for the personal property.

A. Fourteen thousand dollars for the land, and two thousand dollars for the personal property, as I remember.

*   *   *   *   *

Q. State whether or not in allowing the defendants $4,000, in your settlement with them, there was any mistake made.

A. In what shape?

Q. In which you took from them a mortgage and note for $12,000, when it should have been but for $11,000, as they claim?

A. There was no such mistake as I know of; I have no recollection of it.

Q. How much did you claim you were owing them at that time, which they wanted you to pay or secure?

A. I don't remember that they ever told me how much I did owe them.

Q. How much was it agreed upon that you should allow them in this settlement?

A. Four thousand dollars. I understood at the time that they were to have $4,000, and they were to pay expenses and costs, and they were to get me out of here within a year. I think Mr. Colby told me that I would have plenty to start upon — $12,000 and interest — and they would get me out within a year. I supposed they were to pay the costs and expenses, and their fees were included in that for attending to my case afterwards.

Q. Do you remember whether or not you agreed to give them an additional $1,000 if they should get you out within a year, and was that included in a receipt they gave you at the time? State what you know or remember about that?

A. Well, there was no other agreement except the first one for $4,000. All was included in that.

Cross-examination:

Q. Was not the agreement between you and Colby & Hazlett in writing?

A. In regard to what?

Q. In regard to your employment of them in your case.

A. I think it was.

Q. Have you that agreement, or a copy of it?

A. I had a copy; I sent it to Mr. Hardy.

Q. Is not there a receipt for $5,000 indorsed on that agreement by Colby & Hazlett?

A. I think I have a receipt for $5,000.

Q. Have you that receipt now, or can you procure it? If so, will you produce it?

A. I have, and I now produce it:

"BEATRICE, NEB., August 7, 1882.

"Memorandum of agreement by and between Colby & Hazlett of the one part, and William H. Reid, of the other part: It is mutually agreed between Colby & Hazlett, attorneys, and W. H. Reid, that the said Colby & Hazlett are to be employed and are hereby employed, and retained, as attorneys for the said W. H. Reid, to defend him, and have the sole charge and management of the defense of his criminal case for the killing of his wife, and have the entire management, care, and responsibility, of the same; and to work up the said defense and faithfully discharge the duties devolving upon them as attorneys for said Reid through said cause, in consideration of the sum of $150, which is paid them this day, as a retainer, and in consideration of a reasonable, fair, and liberal compensation, to be paid them by the said Reid in addition, for their services. The said Reid is to pay the necessary and reasonable expenses in the court, working up, and defense of his case, procuring facts, evidence, and material, for defense in his behalf, and the expenses of his attorneys in obtaining of the same, and he to perform the ordinary duties of client to attorneys.

"[Signed in duplicate.]      COLBY & HAZLETT.
"W. H. REID."

Indorsed on back:

"Received of William H. Reid the sum of $5,000 in full satisfaction and payment of all claims and demands against him for legal services and expenses up to date in the case of State of Nebraska v. Wm. H. Reid, and in full of all fees for services and expenses hereinafter to be rendered by us in and about said case."

Q. Did not the defendants Colby & Hazlett make out and deliver to you an itemized statement for their fees, charges, and expenses, in your behalf, in writing?

A. No, sir; not that I remember of. I don't think I ever saw one.

Redirect examination:

Q. State how you came to have a receipt for $5,000 from Colby & Hazlett?.

A. When I made the sale there was $4,000 came out of the land.   I had paid them money before—I think about $800.

Q. State what was included in this receipt of $5,000?

A. The $4,000 they received out of the place, and what I had paid them previous.

Q. Was it agreed or understood at the time of the settlement that you were to allow them $5,000 out of the property they purchased of you?

A. No, sir; it was $4,000.

Q. Do you swear that that receipt of $5,000 included any sum paid by you prior to that time?

A. I think it did.

Q. Do you swear positively?

A. Messrs. Colby & Hazlett made it out and gave it to me, and I understood it included that.

Q. You also swear that you didn't know what Colby and Hazlett's bill amounted to, and that they never made any statement of that bill to you?

A. I do.   I didn't know what their bill amounted to, and I don't remember of their making any statement to me.

Q. Do you know and were you not told by Colby & Hazlett for what and to whom the $800 which you say you had paid to them had been expended and paid?

A. No, sir; I don't know who to.   I think they said they had been at considerable expense.   I don't think they ever told me what they were.

Q. Did they not tell you what it cost, and what they had to pay Dr. Mathewson?

A. No, sir; I have no recollection of it.

Q. Did they not tell you, and did you not know, what they had to pay Dr. Fuller?

A. No, sir; I don't remember.   I can't place the man now.

Q. Did they not tell you, and do you not know, what they had to pay the superintendent of the Topeka insane asylum?

A. No, sir; I don't remember it.

Q. Do I understand you to swear that you do not recollect, or that they did not tell you these things?

A. I mean to swear that I do not recollect your telling me, and I think you did not tell me.

Q. Don't you remember of stating to defendant Colby that you thought Dr. Mathewson's bill rather high?

A. I do not.   I think Mr. Colby never spoke to me about it.

Q. Do you remember of defendant Colby telling you what it cost to take those depositions in Allamakee county, Iowa?

A. I think it was $68 for notary's fees, but would not be certain.

Q. You don't recollect of any of the defendants telling you, or your ever knowing, any of the other costs and expenses?

A. I don't remember any other particular expenses.

Q. Don't you remember of the defendants Colby & Hazlett figuring up with you and showing you the amount of the costs and expenses of the first trial of your case?

A. It seems to me that you and Mr. Hazlett did figure on it, but I am not sure.

Q. Did not the defendants Colby or Hazlett give you written receipts for the money paid by you to them prior to March 7, the date of the mortgage?

A. I think they did for what money I gave them before this settlement.   It was spoken of at the time I think.   It was said by one of you that that last receipt would cover up the others.

Q. Have you those receipts in your possession, or under your control? If so, will you produce them?

A. I think Mr. Hardy has them.

Q. Do you swear that you recollect of any remark made by defendants Colby & Hazlett, or by any other person at the time of the settlement, that that last receipt would cover up the others, or anything of that kind or nature?

A. That is what I think.

A. Hardy Esq. testified for the plaintiff:

Q. Did you have a conversation with Mr. Hazlett a week ago Saturday evening about this case?

A. I did.

Q. State what that conversation was?

A. Mr. Saunders was there, and Mr. Hazlett asked that we consent that his testimony be taken at some other time, as he had important business to attend to at Omaha. I said his testimony would probably be needed in the case. I said to Mr. Hazlett in regard to that $5,000 business, I don't think you think there is anything of it. Mr. Hazlett made this remark; he said, I think we claimed five thousand, but it was compromised, as I understand it, at four thousand, and if there is anything in that matter, it is in the personal property. Mr. Saunders stood near by.

Cross-examined by Mr. Hazlett:

Q. Did you and I have a talk about the merits of the case?

A. No further than that.

Q. Isn't all I asked you, to get your leave to go away and to give my testimony after I came back?

A. That is just what you wanted.

Q. That was what I was after and you hated to let me go. Now do you intend to swear that I said we compromised our fees at four thousand dollars?

A. I intend to swear that you used the word "compromised" and said "four thousand dollars."

Q. Did I say that, or did you say it?

A. You said it.

Q. What does Saunders say?

A. He says the same thing.

Q. You are attorney in this case?

A. Yes, sir.

The general object and purpose on the part of the defendants Colby & Hazlett in their interview and transactions with the plaintiff which terminated in the execution and delivery of the deed by him to them and of the note and mortgage by them to him on the night of March 7, 1884, was to make such a disposition of his property as would produce the money claimed by them for their fees and expenses earned and incurred in making his defense, and the object of their haste and industry carrying their operations far into the night was that such disposition might be made before the threatened restraint should be placed upon him by the courts, and he be prevented from making it. In making this disposition of plaintiff's property, it does not appear that either of the parties contemplated or desired the immediate, or cash, payment down of more than a sufficient amount to pay the said fees and expenses. It appears from the testimony of L. W. Colby, Alfred Hazlett, and C. O. Bates, that the bill for services and expenses held by them, and presented to the plaintiff on that occasion, amounted to $6,134.30, and that after allowing payments formerly made amounting to $800, there was a balance due Colby & Hazlett of $5,334.30. According to the testimony of Mr. Hazlett, there were some objections made by the plaintiff, and the amount was reduced, and finally agreed upon at even $5,000. This is not so clearly stated by the other witnesses for defendants; but they all agree that the amount which was to be deducted and retained by Colby & Hazlett out of the price of the farm and personal property, was even $5,000, and in communicating to Kilpatrick, then at Omaha, by telephone, that was the sum which they at first represented as necessary to

be paid down; but that upon Kilpatrick objecting to advancing that amount in cash down, they consented to take $4,000. J. D. Kilpatrick, with whom this telephonic conversation was held by Mr. Hazlett on the part of Colby & Hazlett, corroborates this testimony. It appears that at this settlement Colby & Hazlett gave to the plaintiff a receipt for $5,000 in full satisfaction and payment of all claims and demands, etc. This receipt was retained by plaintiff, and upon the demand of defendants produced at the trial. This receipt and its possession by the plaintiff, is evidence of the highest character that the amount understood and agreed upon at the settlement was $5,000, and not $4,000. In this connection I will observe that the plaintiff in his deposition stated that this receipt covered other sums previously paid; but he does not anywhere claim that he had paid them to exceed $800, previous to this settlement, and there is nothing in the history of these somewhat unusual transactions to lead us to believe that the parties would receipt for even $200 more than they had received or expected to receive, and a part of which they had previously receipted for. I will make no further examination of the facts stated by the plaintiff in his deposition, which are set out at considerable length in this opinion, further than to say that in so far as they relate to the point now being considered, they are chiefly negative in their character, and that they fail to convince the mind of the writer, or sufficiently explain the evidence of a mistake in hearing in the facts above referred to, or of the testimony of the defendants and the witness C. O. Bates.

The consideration of this case brings us quite up to the frontier of the question of the power of a court of review, to reverse or modify the judgment or decree of a trial court upon a matter of fact, under the law and precedents. It must be admitted that such power does not extend to cases of mere conflicting evidence. The rule has been often stated in this court, and applied to cases then under consideration.

In most of these cases, so far as my memory extends, the rule was invoked as a reason, on the part of this court, for refusing to disturb the judgment of the trial court; but such has not always been the case. Among the first of these cases was that of *Seymour v. Street*, 5 Neb. 85, cited by counsel for appellee. In that case the rule is stated in the syllabus as follows:

"5. The findings of a court, when substituted for a jury are entitled to the same weight as the verdict of the latter.

"6. Where a verdict or finding is *clearly wrong*, it should be set aside; but if there is only doubt as to its correctness it will not be disturbed."

In the case of *Blackburn v. Ostrander*, reported in the same volume, at page 219, the court in the opinion says: "It is not the number of witnesses produced by a party, nor their language alone, that should be looked to in determining whether a new trial should be granted, but all the surrounding circumstances should be taken into the account and given due weight." And again, in the case of *The A. & N. R. R. Co. v. Washburn*, also reported in the same volume at page 117, the court in the syllabus says:

"4. A mere difference of opinion as to the weight of evidence between a reviewing court and the court which tried the cause, is not sufficient to reverse a judgment. To do so, the preponderance of evidence must be clear, obvious, and decided, or so great as to indicate prejudice, partiality, or corruption.

"5. A judgment will not be reversed on the ground that the finding or verdict is contrary to the evidence, unless it manifestly is so; and the reviewing court will always hesitate to reverse when doubts as to its propriety arise out of a conflict in oral evidence."

The above cases have been followed in those of *Potvin v. Curran*, 13 Neb. 302; *Hartley v. Dorr*, 15 Id. 451; *Courtney v. Price*, 12 Id. 189; *Jenning v. Simpson*, Id. 558; *Aultman v. Patterson*, 14 Id. 58; and in many subsequent

cases. In no case has it been held, nor can it be, that greater weight will be accorded to the finding of a court in a case tried to it without the intervention of a jury, than to the verdict of a jury; nor has the court ever denied itself the power or the duty to reverse or modify either finding or verdict where it was its clear and settled conviction, upon a review and consideration of the entire evidence, that the tribunal making it had reached an erroneous conclusion to the prejudice of the party complaining. In this connection I copy from the opinion of this court in the case of *Fisk v. The State*, 9 Neb. 62. " A court that would shelter itself behind an erroneous verdict to sustain a judgment that is *clearly wrong*, is unworthy of the name. But a mere difference of opinion between the court and jury is not sufficient to justify the reversal of a case. But where it is clearly wrong it will be set aside, and such has been the uniform holding of this court from its organization. (Citing cases.) In no other way can the rights of parties be protected."

In the case at bar there is no direct finding upon the question of a mistake in the amount of the note; but from a recomputation of the note from the date which it bears to the date of the finding it is quite apparent that in the finding the court rejected the claim and evidence of the defendants of a mistake in the amount of the note; and in so doing, I think, for the reasons above stated, the trial court was clearly wrong.

The finding and judgment of the district court are reversed, and a finding will be entered in the court as of the date of May 1, 1889, in favor of the plaintiff, in the sum of $13,370.32, and a judgment and decree of foreclosure entered herein in his favor for said sum and as of said date.

JUDGMENT ACCORDINGLY.

THE other Judges concur.